# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 13, 2014

## STATE OF TENNESSEE v. CEDRIC WAYNE WATKINS

**Appeal from the Criminal Court for Davidson County**
**No. 2011-A-663      Cheryl Blackburn, Judge**

---

**No. M2013-01268-CCA-R3-CD      Filed 06/04/2014**

---

Appellant, Cedric Wayne Watkins, was convicted by a jury of first degree premeditated murder. On appeal, appellant argues that the evidence was insufficient to support his conviction and that the trial court erred by limiting the testimony of a defense witness. Following our review, we affirm appellant's judgment but remand to the trial court to consider whether the judgment requires correction of a clerical error.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed; Case Remanded**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, joined.

Elaine Heard (on appeal), and Edward J. Gross (at trial), Nashville, Tennessee, for the appellant, Cedric Wayne Watkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Smith, Deputy Attorney General; Victor S. Johnson, III, District Attorney General; and Jeff Burks and Megan King, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

Appellant was indicted by a Davidson County grand jury for the premeditated murder of Thomas Turner, which occurred between July 23, 2009, and July 28, 2009. The parties presented the following evidence at appellant's March 18-20, 2013 trial.

The victim's brother, Davis Turner, testified that the victim was fifty-two years old when he died. The victim had been in the Air Force and had worked for various defense industry firms. Mr. Turner testified that the victim had always had an interest in computers. Mr. Turner first learned in 1995 that the victim had a drug habit. He said that the victim had been living at InTown Suites and had owned a white Ford Probe at the time of his death.

William Ogden testified that he was working at InTown Suites on July 28, 2009. When he was cleaning the parking lot, he smelled a distinct odor and notified his manager that there was probably a dead body on the premises. He could not determine from which room the smell was coming, so he waited for his manager to arrive. Together, they searched several rooms until they found the victim's body in room 135. Mr. Ogden knew the victim as "Bill." Mr. Ogden testified that he and the manager looked into the room but did not enter it. The manager, Kevin Moore, also testified and corroborated Mr. Ogden's testimony.

Lynette Mace, a crime scene technician with the Metro Nashville Police Department, testified that she processed the victim's room along with Sergeant John Nicholson. She described the room as an efficiency apartment. The victim was lying a few feet from the door. A chair was turned over, but there were no other signs of disarray. She saw two computers in the room. Ms. Mace found three spent nine millimeter shell casings and two projectile fragments. There was a "strike mark" on one wall, and she found a projectile lodged inside the wall at that location. Ms. Mace processed the room for fingerprints and "DNA touch evidence." She also used vacuum filters to collect any trace evidence.

Brianna Stanton testified that in 2009, she lived in various hotels with different people and abused crack cocaine. She said that "[m]ost of the time," she lived with appellant, whom she knew as "Frank White." Ms. Stanton said that she also lived with Stephanie Littlejohn and "Hannah." Other acquaintances included William Carter (a/k/a "Will C."), Bobby Gurley (a/k/a "B.O."), and Chaz Ellis (a/k/a "Cuz"). Mr. Carter was a barber and had a car. She was also acquainted with the victim, whom she knew as "Bill Gates." She recalled an occasion when the victim bought drugs and wanted to try the drugs before he left, which was unusual behavior for him. She and appellant later discussed the possibility of the victim's being a "snitch." Ms. Stanton testified that several days before she learned of the victim's death, Mr. Carter had driven appellant somewhere. When they returned, appellant, supposing that Ms. Stanton knew what had happened, said that they "were all supposed to take it to the grave." She said that she did not ask any questions. Ms. Stanton learned about the victim's murder on the news. When his murder was reported, appellant said, "'[W]ell, there it is.'" Sometime later, she heard that Mr. Carter had been "running around talking about" what appellant had done. Appellant called Mr. Carter to come to their hotel room, and he "asked [Mr. Carter] why he was running his mouth and smacked him for doing it." Ms. Stanton agreed that she had testified in a prior proceeding that appellant said something "along the

lines of[] they had to do what they had to do to somebody who was snitching" and that "the four of us in the room would take it to the grave."

Ms. Stanton recalled that the first time she talked to detectives about the victim's murder, she denied any knowledge of what occurred. Detectives talked to her again in December 2010, while she was in jail, and she told them what she knew. Ms. Stanton and appellant spoke by telephone at least twice while she was in jail, on November 14, 2010, and December 19, 2010. The State introduced recordings of those telephone conversations into evidence. In the November conversation, Ms. Stanton mentioned that she "hope[d] that[] everybody does what they said they were going to do," and appellant asked her whether she had heard from anyone "with a badge." Ms. Stanton testified that they were both referring to the victim's murder. In the December 2010 conversation, appellant told Ms. Stanton to "[s]tick to the script" and said that they would "fight this s*** to the end." Ms. Stanton "guessed" that he was referring to the victim's murder. She agreed that she had previously testified that "sticking to the script" meant that no one would say anything.

Stephanie Littlejohn testified that in July 2009, she lived in hotel rooms and was engaging in prostitution and drug sales. She lived with appellant, whom she knew as Frank White. Ms. Stanton and "Hannah" also lived with her and appellant. Ms. Littlejohn testified that she was acquainted with Chaz Ellis, Bobby Gurley, William Carter, and the victim. She said that the victim was called "Bill Gates" because "[h]e was smart[, and] he fixed computers." Ms. Littlejohn recalled that the victim came to her hotel room on July 23, 2009, to take her to buy marijuana. When they returned to the hotel room, she gave the victim her laptop so that he could work on it. After the victim left, the group present at the hotel discussed whether the victim had "snitch[ed]" on Mr. Gurley and Mr. Ellis because they had been arrested. Ms. Littlejohn testified that appellant and Mr. Carter left the hotel to visit the victim. She said that she asked them to pick up her laptop while they were there. She further said that she "had a feeling" about the purpose of their visit but that "[i]t was kind of one of those things that [was] left unsaid."

Ms. Littlejohn testified that appellant and Mr. Carter returned thirty to forty-five minutes later. She recalled that appellant "was just in tears, and he said the Lord's prayer." Appellant had her laptop but would not let her have it. Ms. Littlejohn said that she learned about the victim's murder approximately a week later when it was reported on the news. She did not remember appellant's saying anything about the murder immediately after it was on the news, but she testified that at some point appellant told her that he had shot the victim three times. Ms. Littlejohn also testified that appellant confronted Mr. Carter about Mr. Carter's telling his girlfriend what had happened the day of the victim's murder. Appellant "smack[ed]" Mr. Carter and took him into the bathroom. Ms. Littlejohn remembered Mr. Carter's asking appellant not to kill him. Ms. Littlejohn testified that she did not talk to the

police about the victim's murder until September 2010. At first, she denied any knowledge but eventually told the police the information about which she testified at trial.

On cross-examination, Ms. Littlejohn clarified that appellant told her on the same day of the murder that he had shot the victim, not at a later point in time. She also stated that she did not remember telling Deborah Cox about a statement made by appellant with regard to the victim's murder.

William Carter testified that he was acquainted with appellant, Ms. Littlejohn, and Ms. Stanton. He also knew Mr. Gurley and Mr. Ellis, but he did not know the victim. He said that he had heard "the women" talk about the victim and that he knew the victim was a drug user. Mr. Carter testified that Mr. Gurley and Mr. Ellis were both arrested in 2009 and that he subsequently heard a rumor that the victim was "snitching." He did not know whether the victim's alleged "snitching" was related to the arrests of Mr. Gurley and Mr. Ellis. Mr. Carter testified that on July 23, 2009, appellant called him to cut his hair. He went to the hotel where appellant was staying. After cutting his hair, appellant asked Mr. Carter to take him somewhere to pick up something. Mr. Carter did not consider that an unusual request. Mr. Carter drove appellant to InTown Suites at appellant's direction. When they pulled into the parking lot, appellant pointed out the car for which he had been looking. Mr. Carter identified a picture of that car, which had been previously identified as belonging to the victim. Mr. Carter said that he saw a woman he knew standing on the second or third level of the hotel. He spoke to the woman, and appellant told him to leave. He drove to the end of the building, where appellant got out of the car. Mr. Carter said that he turned his car around and then saw appellant running toward him, carrying a laptop computer. Appellant got into Mr. Carter's car, and they drove away. Mr. Carter testified that while in the car, appellant said, "'[T]wo shots to the head[;] he ain't talking no more.'" Mr. Carter said he did not know what appellant meant and that he had heard similar phrases "in some rap lyrics." Appellant also took off his shirt and threw it out of the window of the car. Mr. Carter did not see appellant with a gun that day.

Mr. Carter testified that when the news reported the victim's death, they showed a photograph of the InTown Suites. Mr. Carter told his girlfriend that he had driven appellant to that location, but he did not associate that incident with the victim's murder. He testified that approximately one month later, appellant called him to cut his hair. Mr. Carter went to appellant's hotel room and cut his hair. Subsequently, appellant punched him in the jaw and said, "'[B]****, you been [sic] running your mouth about taking me to the room.'" Appellant also pulled him into the bathroom and told him that "if [he] ever said anything[,] someone would kill [Mr. Carter] and [his] family." Mr. Carter testified that the following day, he was arrested for failing to pay his child support obligations. He was incarcerated for five months. He was arrested on September 20, 2010, for a traffic violation and served five days in jail.

-4-

While he was in jail for the traffic violation, Detective Wall came to speak with him about the victim's murder. He did not admit to knowing anything at that point. In March 2011, Mr. Carter saw on the news that he was wanted for first degree murder, so he turned himself in to the police. Detective Wall interviewed him again, and he gave a full statement.

Dr. Bridget Eutenier, an associate medical examiner in Davidson County, testified that the victim was shot in the front of his head three times: on his left eyebrow, in front of his left ear, and below his right eye. Two of the bullets exited, but one was recovered "from the posterior scalp." The victim's body was in a state of decomposition, making it difficult to determine the trajectory of the bullets. Dr. Eutenier testified that "[a]ll three wounds would have been fatal." Dr. Eutenier estimated that the victim had died "a few days" prior to his discovery.

Metro Nashville Police Detective Corey Wall testified that he was the lead investigator in this case. He said that the victim's brother, Davis Turner, provided him with the victim's cellular telephone number. Subsequently, Detective Wall obtained the victim's telephone records. The last call that the victim made was on July 23, 2009, at 5:12 p.m. Detective Wall had the Identification Department compare fingerprints from people with whom the victim had communicated with the fingerprints lifted from his hotel room. There were no matches. In addition, no DNA was found in the victim's hotel room other than his own. The computers from the hotel room were also analyzed but contained no useful information.

Detective Wall testified that he also interviewed persons of interest identified through the victim's telephone records. In particular, he interviewed Stevie Downs, who suggested that he speak with Chaz Ellis. Detective Wall first spoke with Mr. Ellis in August 2009, but he denied any knowledge of the victim's murder. In July 2010, Mr. Ellis's attorney contacted Detective Wall and told him that Mr. Ellis wished to speak with him. When they met, Mr. Ellis suggested that Detective Wall talk to Stephanie Littlejohn and Brianna Stanton. Detective Wall and his partner, Detective Derry Baltimore, spoke with Ms. Littlejohn while she was incarcerated in September 2010. She was reluctant to divulge any information at first, but after they "leaned on" her, she told them about how she knew the victim and that the victim had been working on her laptop. She also told them about appellant's returning to their hotel room after having gone out with Mr. Carter. Ms. Littlejohn said that appellant gave her back her laptop, said a prayer for the victim, and told her that he had "shot the victim three times in the head." From Ms. Littlejohn's information, Detective Wall attempted to interview William Carter on September 30, 2010, but he refused to speak with the police. Detective Wall and Detective Baltimore interviewed Ms. Stanton in December 2010. She gave a statement that was consistent with Ms. Littlejohn's statement. Subsequently, Mr. Carter and appellant were both charged with the victim's murder. After

Mr. Carter was taken into custody, he gave a statement that was consistent with Ms. Stanton's and Ms. Littlejohn's statements. Thereafter, appellant was arrested.

Tennessee Bureau of Investigation Agent Alex Brodhag testified as an expert in forensic firearms examination. He said that the police submitted the following evidence to him for analysis: a fired bullet core; three fired nine millimeter Luger cartridge cases; a fired jacketed bullet; a fired bullet core fragment; and a fired hollow point bullet jacket. Agent Brodhag determined that the three nine millimeter cartridges were fired from the same weapon. He further determined that the fired bullet core, the fired jacketed bullet, and the fired hollow point bullet jacket were consistent with nine millimeter bullets. The bullet core fragment was not useful for comparison purposes. The markings on the jacketed bullet and hollow point bullet jacket had the "same class characteristics," but there were not enough markings to conclude that they were fired from the same weapon. In addition, Agent Brodhag could not determine whether the fired bullets were originally paired with the three cartridge cases and, therefore, could not determine how many weapons were used. Following Agent Brodhag's testimony, the State rested its case.

On behalf of appellant, Deborah Cox testified that Stephanie Littlejohn and Brianna Stanton lived with her for a time after July 2009. Ms. Cox said that Ms. Littlejohn told her, "'I killed Bill Gates[;] I shot him in the back of the head[.] [T]he gun will never be found[;] it's in pieces all over this town.'"

After the close of proof and deliberations, the jury found appellant guilty as charged. Appellant's motion for new trial was unsuccessful. This appeal follows.

II. Analysis

A. Sufficiency

Appellant contends that the evidence was insufficient to support his conviction. In particular, he argues that there was no physical evidence connecting him to the crime scene and that many of the witnesses were not credible. The State responds that the evidence was sufficient. We agree with the State.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant

must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The jury convicted appellant of premeditated murder. Tennessee Code Annotated section 39-13-202(a) defines this category of first degree murder as "[a] premeditated and intentional killing of another."

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). In reviewing the sufficiency of the evidence, we must determine whether the State established the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). The presence of premeditation is a question of fact for the jury, and the jury may infer

premeditation from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

A defendant's "state of mind is crucial to the establishment of the elements of the offense," thus, the State may prove premeditation by circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Several factors support the existence of premeditation including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *Brown*, 836 S.W.2d at 541-42; *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)).

Viewed in the light most favorable to the State, the evidence showed that appellant, believing the victim to be a "snitch," went to the victim's hotel room and shot him three times in the head. Stephanie Littlejohn and Brianna Stanton both testified that appellant was concerned that the victim had given information to the police about Chaz Ellis and Bobby Gurley. William Carter testified that he drove appellant to the victim's hotel room. Appellant left the car briefly, and when he returned, he commented, "'[T]wo shots to the head[;] he ain't talking no more.'" Appellant also threw away the shirt he had been wearing. Mr. Carter's testimony was corroborated in part by Ms. Littlejohn's testimony. Ms. Littlejohn said that the victim had her laptop to work on it. She further said that she knew appellant was going to visit the victim and that she asked him to bring her laptop back when he returned. When appellant returned to the hotel room, he had her laptop. Ms. Littlejohn also testified that appellant said a prayer for the victim and told her that he had shot the victim three times in the head. The medical examiner confirmed that the victim had three gunshot wounds to the front of his head.

Mr. Carter, Ms. Stanton, and Ms. Littlejohn all testified that appellant threatened Mr. Carter after learning that Mr. Carter told his girlfriend about taking appellant to the victim's hotel. In addition, Ms. Stanton testified that the victim's murder was the subject of the telephone conversations between herself and appellant. Detective Wall testified that Ms. Littlejohn, Ms. Stanton, and Mr. Carter each gave statements during the investigation that were consistent with each other. Appellant's argument regarding the credibility of the witnesses is without merit. All witnesses were thoroughly cross-examined, and the jury assessed the testimony and evidence at trial. We will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379. Moreover, it was within the purview of the jury to convict appellant based on the witnesses' testimonies, despite a lack of physical evidence connecting appellant to the victim's murder. *See State v. Jeremy Stevenson*, No. W2011-

02053-CCA-R3-CD, 2013 WL 587313, at *12-14 (Tenn. Crim. App. Feb. 13, 2013), *no perm. app. filed*. Thus, we conclude that the evidence was sufficient to support appellant's conviction for first degree premeditated murder.

## B. Limitations on Deborah Cox's Testimony

Appellant argues that the trial court improperly limited the testimony of Deborah Cox regarding a second statement made to her by Stephanie Littlejohn. The State responds that appellant did not lay a proper foundation for Ms. Cox's testimony under Tennessee Rule of Evidence 613(b). While we agree with the State's argument, based on our review of the record, we conclude that appellant waived review of this issue by acquiescing to the trial court's ruling.

Prior to her in-court testimony, the trial court held a jury-out hearing to determine what Ms. Cox's testimony would be. In addition to the statement she claimed Ms. Littlejohn made about her shooting the victim, Ms. Cox also said that Ms. Littlejohn informed her that she did not want to be around an unnamed person who knew what she had done to the victim. According to Ms. Cox, Ms. Littlejohn also described the clothing she wore when she killed the victim.

Prior to its ruling, the trial court asked how the statements other than Ms. Littlejohn's alleged confession were admissible. Appellant's counsel responded, "I'm not sure it is[,]" with no further argument. Thus, appellant's counsel acquiesced to the trial court's ruling that only the first part of Ms. Cox's testimony was admissible. Therefore, appellant has waived plenary review of this issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Moreover, even if appellant did not acquiesce to the ruling, Ms. Littlejohn had not been afforded an opportunity to explain or deny any alleged statement she made about her own involvement in the victim's murder, having only been asked about a statement she made regarding appellant's involvement; therefore, any extrinsic evidence of a prior inconsistent statement was not admissible. *See* Tenn. R. Evid. 613(b). Appellant is without relief as to this issue.

## CONCLUSION

Based on the record, the briefs of the parties, and the applicable law, we affirm appellant's judgment. However, our review of the record reveals a discrepancy regarding appellant's sentence. The trial court's minutes state that appellant was sentenced to life without the possibility of parole while the judgment states that he was sentenced to life. In

addition, during the motion for new trial, the trial court stated that appellant was sentenced to an "automatic sentence of life imprisonment." We note that the briefs of the parties disagree about appellant's sentence, with appellant's brief stating that he received a sentence of life without the possibility of parole. The record is insufficient for this court to determine whether the judgment form needs to be corrected. *See* Tenn. R. Crim. P. 36 (providing for correction of clerical errors in judgments); *State v. Robert Eugene Rutherford*, No. E2005-00664-CCA-R3-CD, 2006 WL 2252728, at *7 (Tenn. Crim. App. Aug. 7, 2006). Therefore, we remand to the trial court for it to consider whether the judgment requires correction of a clerical error.

_____

ROGER A. PAGE, JUDGE